1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,    :    23-CR-118(BMC)

        Plaintiff ,    :
                            United States Courthouse
   -against-    :    Brooklyn, New York

RASHAWNEE GRAY,    :
                            August 22, 2024
        Defendant.    :    11:15 a.m.

- - - - - - - - - - - - X


TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:


For the Government:    BREON PEACE
                           United States Attorney
                           BY: ANDREW D. WANG,
                           Assistant United States Attorney
                           271 Cadman Plaza East
                           Brooklyn, New York


For the Defendant:    FEDERAL DEFENDERS OF NEW YORK
                           One Pierrepont Plaza, 16th Floor
                           Brooklyn, New York
                           BY: KANNAN SUNDARAM, ESQ.


Court Reporter:    Andronikh M. Barna
                           225 Cadman Plaza East
                           Brooklyn, New York
                           (718) 613-2178

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

```
                    Proceedings                         2
```

1            THE COURTROOM DEPUTY:  U.S.A. versus Rashawnee Gray.

2            Please state your appearance for the record,

3    starting with the Government.

4            MR. WANG:  Good morning, Your Honor.

5            For the United States, Andrew Wang.  With me at

6    counsel table is Probation.

7            USPO GERVASE:  Thank you, Your Honor.  Good morning.

8            Probation Officer Nicole Gervase.

9            MR. SUNDARAM:  Kannan Sundaram, Federal Defenders of

10   New York, with Mr. Gray.

11           THE COURT:  Good morning.

12           All right.  We are on for sentencing.

13           Let me first determine if I am going to accept the

14   guilty plea that Mr. Gray gave to Magistrate Judge Scanlon.  I

15   reviewed the transcript of that plea from December 12th of

16   last year.

17           Mr. Gray, is it still your desire to plead guilty?

18           THE DEFENDANT:  Yes, Your Honor.

19           THE COURT:  Is everything that you told the

20   Magistrate Judge on that date true?

21           THE DEFENDANT:  Yes, Your Honor.

22           THE COURT:  Mr. Sundaram, do you know of any reason

23   I should not accept the guilty plea?

24           MR. SUNDARAM:  No, Your Honor.

25           THE COURT:  Having reviewed the transcript and heard

Proceedings                                            3

1   the Defendant and Counsel's answers to my questions, I find

2   that the Defendant is acting voluntarily, that he understands

3   his rights and the consequences of his plea, and that there is

4   a factual basis for the plea.  I therefore accept the plea of

5   guilty to Count Two of the indictment.

6            Next let me go over with you the documents that I

7   have reviewed in preparing for the sentencing so that we're

8   all on the same page.

9            I have the presentence investigation report of

10  March 12th.  There is one addendum to that report that is

11  dated March 11th and then revised August 19th of 2024.

12           I have a sentencing memorandum from Mr. Sundaram of

13  August 12th with exhibits annexed to it.

14           I have received another exhibit, a character

15  reference letter, this morning.

16           And then I have the Government's sentencing

17  memorandum of August 15th.

18           Any other documents I should be looking at?

19           MR. WANG:  No, Your Honor.

20           MR. SUNDARAM:  Your Honor, all the documents you

21  named, that's the entirety of the documents.

22           However, and I apologize for this, so Mr. Gray, as

23  the Court knows, lives in Buffalo, New York.  He flew in -- I

24  think he drove in, like, apparently in the middle -- I mean,

25  he just got here like very, very late.  And I actually thought

Proceedings                                                          4

1    the sentencing was at 11:30.

2             THE COURT:  Oh.

3             MR. SUNDARAM:  I looked at my book and I'm wrong, it

4    was 11:00.  That's why they texted me, I was in the courthouse

5    waiting to meet with Mr. Gray.

6             So the only snag here is that I e-mailed -- I sent

7    him the sentencing filings by e-mail.  He had provided me the

8    letters of support, so he's seen that.  I sent them some time

9    ago.  We occasion -- we usually communicate by text.  We

10   sometimes talk on the phone.  It's been difficult because both

11   of our schedules to actually talk.  But he -- I did not know

12   this, but he actually has not seen the sentencing submissions.

13            THE COURT:  Do you want some time?

14            MR. SUNDARAM:  Yes, if that's okay.  I don't know

15   what your schedule is right now.

16            THE COURT:  I don't know either.

17            Tasha, what is our next thing?

18            THE COURTROOM DEPUTY:  The next is at 2:15, so we

19   have time.

20            THE COURT:  What do you need?  Half an hour?

21   20 minutes?  Less?

22            MR. SUNDARAM:  It's a half an hour.

23            THE COURT:  Okay.  Let's reconvene at let's say a

24   quarter to twelve.  Okay?

25            MR. SUNDARAM:  Thank you.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                    Proceedings                    5
```

1         THE COURT:  Okay.  See you then.

2         (Recess taken.)

3         THE COURT:  We are back in session.

4         Mr. Sundaram, you had a chance to go over the

5    sentencing memo with your client?

6         MR. SUNDARAM:  Yes, Your Honor.  And Mr. Gray and I

7    both thank the Court for that opportunity.

8         THE COURT:  No problem.

9         Let me just ask, for the sake of good order, that

10   you've also had a chance to review with him the presentence

11   investigation report and the addendum?

12        MR. SUNDARAM:  Yes.

13        THE COURT:  Okay.

14        Is that right, Mr. Gray, you've gone over the

15   presentence investigation report and the addendum with

16   Mr. Sundaram?

17        THE DEFENDANT:  Yes, Your Honor.

18        THE COURT:  Okay.  The Second Circuit has been

19   sticky about that lately, so I like to ask.

20        Okay.  With regard to the facts that will control

21   this sentencing, I don't think there is any dispute about the

22   description of the offense or the offender characteristics as

23   set forth in the PSR and the addendum.  We will talk about

24   quantity in a minute with regard to the Guidelines, but the

25   description of the offense and the offender characteristics I

Proceedings                                                          6

1  think we're all on the same page with.  Is that right?

2              MR. WANG:  That's correct, Your Honor.

3              MR. SUNDARAM:  Yes.

4              THE COURT:  All right.  I will adopt those portions

5  of Sections A and C of the PSR as modified by the addendum as

6  my findings of fact for purposes of this sentencing here.

7              Next, let's talk about the Guidelines which are, of

8  course, merely advisory and only one factor for me to consider

9  in determining the appropriate sentence.

10             I think we're all now agreed that we're not talking

11 about 11 ki's, we're talking about either 4 or 2.

12             Are you still contesting the 2, Mr. Sundaram?

13             MR. SUNDARAM:  Yes, I'm not contesting the 2.  I'm

14 arguing that the most the evidence shows, which I think the

15 facts aren't really disputed, is it would support the 2 and

16 not more than that.

17             THE COURT:  Okay.  Tell me why, because I'm kind of

18 convinced by the Government's argument.

19             MR. SUNDARAM:  I understand.

20             And I'm not disputing, to be clear, that the Court

21 can't or shouldn't -- that what the Court can't rely on

22 coconspirator statements.  In this case, that's what the

23 Government is relying on.  They're saying that Lozano was

24 essentially telling the person he was talking to, the

25 informant or the undercover, that this person would be buying

Proceedings                                                          7

1    two different shipments of 2, that he would be buying 2 and 2

2    and offering an explanation why that is and saying it was 4.

3           However, the Government points to the initial

4    transaction that didn't happen in January, that was for 3.  So

5    either one of those would still be at the base offense level

6    of under 3 and a half kilograms.

7           Now, what I'm saying is that the Government has to

8    make this and the Court would have to make a finding by a

9    preponderance of the evidence.  And the evidence, as the

10   Government based, recited in the complaint, the Government's

11   discovery, all the conversations in which Mr. Gray talked to

12   anybody was just about the 2.

13          So I understand that it's, in general, appropriate

14   to rely on coconspirator statements, but that's because the

15   coconspirator -- under the theory that the coconspirator is

16   speaking for the Defendant, for his coconspirator.

17          And in a case where the coconspirator is promising

18   more than the conspirator himself has actually agreed to, I

19   don't think it's appropriate to rely on the coconspirator

20   statement, because the theories that are behind why a

21   coconspirator statement is admissible against a defendant

22   don't really apply in that situation.  That theory is

23   essentially that the Defendant is sort of licensing and

24   agreeing to all of this.  But if the Defendant himself is

25   saying, no, I want to buy 2 and the coconspirator is saying,

Proceedings                                    8

1   well, he's going to buy more, he's going to buy 4, I think you

2   have to go with what the Defendant -- the evidence really

3   doesn't -- you know, if you look at all of the statements the

4   Government is citing, it appears that Lozano had bigger

5   ambitions for this person than the person himself had.

6          THE COURT:  Show me where Mr. Gray was limiting

7   himself to 2.  I see all the statements from Lozano saying

8   that it's 4, but I'm not seeing where Mr. Gray narrowed that

9   to 2.

10          MR. SUNDARAM:  The complaint, at paragraph 13,

11  has -- I don't have that complaint with me, but it's on the

12  docket.  And it says that Mr. Gray -- and that, it indicates

13  that Mr. Gray agreed to pick up 2 kilograms of the cocaine.

14  Those are conversations that had actually involved Mr. Gray.

15          The Government quotes in its papers some statements

16  by Mr. Gray.  There are no statements -- there are no recorded

17  conversations, among the many in this case, where Mr. Gray

18  ever says anything other than just the 2.  He doesn't say 4.

19          I agree that he says 3 with respect to January.

20          THE COURT:  But didn't he talk about another

21  transaction?

22          MR. SUNDARAM:  Again, the Government is I think -- I

23  just want to be clear.  I think the Court is referring to what

24  the Government talks about at maybe page 5 of their filing

25  where they say the Defendant makes references to...

Proceedings                                          9

1          THE COURT:  Well, the Defendant said he would bring

2    $35,000 for 3.  And that was on January 29th.

3          And then later that day Mr. Gray asked to check

4    everything over because of previous experience and he'd like

5    to establish something, a strong, firm relationship.  And then

6    every time we got something, that he would bring it to Mr. --

7    the confidential source would bring it to Mr. Gray.

8          And Mr. Gray said:  Okay, perfect.  Perfect.  I

9    appreciate to hear that.  You know, it's a little difficult,

10   our first round, but you're dealing with somebody that's

11   mature.

12         And that sounds like a higher quantity than just the

13   three that Mr. Gray had mentioned in that initial phone call.

14         MR. SUNDARAM:  I understand.  I mean, the standard

15   is what it is for sentencing and for Guidelines.

16         You know, there's an element of possible statements

17   being made to gain trust with the person he hasn't dealt with

18   before.  But whenever there's specific discussions of what

19   he's going to do, it's pretty specific and it doesn't really

20   support what -- it sounds like Lozano wants Gray to do

21   additional actual transactions.

22         THE COURT:  Yes, I mean, that part is clear.

23   Whether it's a shared expectation, I guess that's what I've

24   got to determine.

25         All right.  Let me hear from the Government on that.

Proceedings                    10

1        MR. WANG:  Your Honor, I think Defense Counsel is

2   correct that we are largely relying on the coconspirator's

3   statements for the Court to make a finding that this was

4   contemplated to be a transaction involving 4 kilograms in

5   total, involving two different trips, and there was the

6   limitation I guess on space, which explains why they would

7   have to be two separate trips.  So I'm not going to address

8   that particular argument.

9        Further, except to comment that for the larger

10  context of these conversations, it is clear that there is an

11  ongoing relationship between Mr. Lozano and the Defendant and

12  an expectation that he would be purchasing significant amounts

13  of cocaine, no one disputes the initial transaction that

14  failed ultimately was contemplated to involve 3 kilograms.

15  And despite eating a loss of $35,000, which is no small

16  amount, not an amount --

17       THE COURT:  Well, let me stop you, only because I

18  appreciate the argument that he's in the business.  I got

19  that.  And that's something that I will take into account.

20  But right now I'm just focused on the quantity that he is

21  responsible for that we know about.  You know, we can draw all

22  kinds of inferences about other things, but in getting from

23  3 to 4, I mean, you might be able to say, well, draw the

24  inference to 11, draw the inference to 10 because he's in the

25  business.  And like Mr. Sundaram said, Lozano clearly wanted

Proceedings                                11

1   him for at least 4.

2          I think I'm going to give him the benefit of the

3   doubt and say we don't have enough heard evidence to say it's

4   more likely than not, one way or the other.  So I'm going to

5   assume it's 3.  And if I make that conclusion, where does that

6   leave us on the Guidelines?

7          MR. WANG:  Your Honor, I think if the Court makes

8   that finding, the Guidelines would be those proposed by

9   Defense Counsel in his submission, which would be 37 to 46.

10          THE COURT:  Okay.

11          All right.  And that's based on a criminal history

12   category of one.

13          So it's a very close question, but because it's a

14   close question, I'm going to resolve it in his favor.

15          All right.  So that's my finding on the Guidelines,

16   37 to 46 months.

17          Let me hear from the parties as to the other 3553(a)

18   factors.

19          And I will start with you, Mr. Sundaram.  And I have

20   to tell you what is troubling me the most about this is it

21   sure does sound like Mr. Gray is not just a one-off recipient

22   of drugs here.  It sounds like this is not his first rodeo.

23   He's in a car with his father and he's transporting around

24   $35,000, which I don't know where he got that kind of money as

25   a barber.  So, you know, forgetting about the Guidelines for a

1   minute, this is not, obviously, a drug mule kind of situation.

2              (Defense Counsel conferring with client.)

3              MR. SUNDARAM:  So, Your Honor, I am not arguing --

4   and I don't think I did argue in my papers -- that this is

5   completely akin to a mule situation, which is why I'm not

6   arguing for any role reduction.

7              However, I am -- we are disputing this notion that

8   Mr. Gray was really involved in this sort of business.  The

9   $35,000, I didn't -- you know, the 30 -- that $35,000 shipment

10  was not -- sorry, that $35,000 quantity of money was something

11  that I've explored in the course of the case with Mr. Gray

12  and what I've learned is that it wasn't, it wasn't money from

13  illegal activity, it wasn't drug proceeds.  He had not done

14  this before.

15             And he -- this came up in the context of him talking

16  about forfeiture and talking about why they took money that

17  was his money.  And it was complicated because we are not

18  disputing the purpose of that trip, but where that money came

19  from -- that money was to buy drugs.  Where that money came

20  from was not entirely his work savings, but $10,000 of it was.

21  And the other $25,000, believe it or not, that he provided --

22  that his father provided, was from his father winning lottery

23  winnings of $25,000.  So he actually had, that money -- I

24  understand that there is a different forfeiture theory that's

25  being used -- I think it's the second section of the

Proceedings                            13

1  forfeiture -- that is being used to perpetrate the crime.

2           So, but this is not a person who -- you know,

3  he's -- if you look at his entire background, he's, you know,

4  renting an apartment, he's living a life that's consistent

5  with his --

6           THE COURT:  Yes, I know he's not a high-flyer.  I

7  got that.

8           But, you know, he's getting together with his father

9  to come up with $35,000.

10          MR. SUNDARAM:  His father wasn't involved and didn't

11  know what was happening.

12          THE COURT:  Didn't know about it?

13          MR. SUNDARAM:  His father was not involved in

14  whatever happened.

15          THE COURT:  His father was giving him $25,000 for?

16          MR. SUNDARAM:  I mean...

17          THE COURT:  You know, there's a point at which it

18  strains credulity, right?

19          And then what did Mr. Gray think he was going to do

20  when he paid $35,000 with these drugs?

21          MR. SUNDARAM:  I'm just talking about what his

22  father knew.  I understand the point about the drug purchase.

23  All I'm saying is, I mean, he is -- I don't know where you put

24  him.  I would say he's a low-flyer in terms of this is not

25  what he's been doing, this is not the way he is living his

1    life.  It is -- I actually believe this is essentially

2    aberrant conduct, not somebody who's been doing this for a

3    period of time.

4          I understand there's some puffery going on when he's

5    talking to -- I mean, I think if you really look at that

6    November 28th interaction, to me it looked like some having

7    cases, a number of cases like this over -- it struck me, it

8    seemed sort of amateurish.  It didn't seem like he was

9    actually that sophisticated.  It's like he's trying to pass

10   himself off.  And I think that's reflected in the other

11   conversations where he's actually talking.

12         THE COURT:  I mean, I think that is a viable

13   argument.  I mean, what you call puffery, it sounds a little

14   bit like that to me.  I can't really tell.  But it's certainly

15   a viable argument.

16         MR. SUNDARAM:  So, Your Honor, too, if I can address

17   some of the -- I don't know want to go over all the arguments

18   I already made, just to address some of the, maybe start with

19   some of the things that the Government has argued and also

20   with the Guidelines in general.

21         I know -- well, I don't know.  I mean, I'm inferring

22   from the Court's words and similar things you've said in other

23   cases that it's not so much whether it's 37 or 46 as to what

24   we're actually looking at here in terms of the person's

25   history and characteristics.  And I understand that it could

Proceedings                    15

1   be looked at in the way that the Government wants the Court to

2   look at it based on some of the quotations from, you know,

3   conversations Mr. Gray had, recorded conversations.  But you

4   really -- this was a misguided venture, but it was something

5   new to him, it wasn't something that engaged in.

6           And if you look at his history as recounted in the

7   presentence report and the information also just received from

8   other people who have known him both personally and

9   professionally, he's been pretty much a career barber.  He's

10  made reasonable money from that.  And apparently, for whatever

11  reason, he decided to try to make some more money committing a

12  crime.  But it really isn't who he is, it isn't who he has

13  been, and it certainly isn't who he is going to be going

14  forward.

15          I do remember a sentencing before Your Honor many,

16  many years ago where I and the Government -- not this AUSA --

17  were engaging in a series of, like, complicated arguments

18  about the Guidelines.  And you said to both of us something

19  along the lines of:  I don't know why you spent so much time

20  discussing the Guidelines because there's -- and I don't want

21  to misquote you.  I don't remember exactly what you said.

22  Something to the effect of:  There's never going to be a case

23  where the Guidelines are going to override the 3553 factors.

24  And I've seen that in other cases.  And I'm not going to try

25  to cite your own sentencings because I know I read cases

Proceedings                                              16

1  different.  But with this court and other courts in this

2  building, there cases where the Guidelines might be 50,

3  60 months and the non-custody sentence is still deemed

4  warranted.  And some of those cases are drug cases.  Most of

5  them are career cases, I'll grant you that.  But there's some

6  cases where there's a delivery or something like that and

7  sometimes if it isn't something that the person has really

8  been engaged in and they're exhibiting positive progress

9  during a substantial period of pretrial supervision, all of

10 that I think weighs heavily in terms of one important factor,

11 which is protecting the public from further crimes of the

12 Defendant.

13        The Government argues here that a significance

14 sentence would promote respect for the law and promote general

15 specific deterrence.

16        Now, in terms of specific deterrence is what I'm

17 talking about right now.  It may be true that incarcerating

18 the Defendant, incarcerating Mr. Gray would add additional

19 specific deterrence, but that's not really the issue.  The

20 real question on the 3553 is whether this is necessary.  And

21 it shouldn't -- not only a Guidelines sentence should be

22 imposed unless it's necessary, but really incarceration

23 shouldn't be imposed unless it's necessary.  And in this case

24 you have -- whatever you want to make of these things we've

25 been discussing, you have a first offender, you have a

Proceedings                                    17

1   zero-point offender, a zero-point offender amendment or

2   whatever you want to call that.  That provision was based on

3   strong statistical, empirical research that made a distinction

4   between people with zero criminal history points and other

5   people.  So you have objective reasons to conclude that

6   incarcerating Mr. Gray is not necessary to stop him from

7   re-offending in this matter or in any other matter.

8          But on top of that, you also just have a very long

9   period, coming up on two years of post -- of pretrial

10  supervision in which the only issues that he's ever had are

11  having ingestible marijuana, which only started the beginning

12  of this year, was brought on -- I can assure you it was

13  brought on by the stress of this case, sentencing was coming

14  up.  And he's addressed that in the right way since that time.

15  He's been in treatment.  So you have that.

16         And then you have the fact that if the Court is

17  really concerned about recidivism or re-offending, there is

18  still other things that can be -- that you can do short of

19  incarceration, such as monitoring, home detention, even

20  community confinement.  And that same -- that applies equally

21  to punishment.

22         With respect to general deterrence, you know, that's

23  a tough one.  I mean, I don't know, that's -- I'm not an

24  expert in that.  I don't think that is the sort of situation

25  where other people are going to learn about or hear about the

1  case.  If they were, if you wanted to look at what Mr. Gray's

2  actually subjectively gone through, somebody who's been a

3  law-abiding person who cares about his family and cares about

4  his community, to go through something like this, you know,

5  he's been tormented by this more than most people, most

6  clients I've had.  He's always worried about the case.  It's

7  brought on his -- back his migraines.  It's induced him to

8  start using marijuana to relax himself.  It stressed out his

9  family.

10         That's his mother.  She traveled from

11  North Carolina.  She's a public school teacher, middle school

12  teacher in North Carolina.  School has actually started there,

13  so she had to take time off to be here.

14         THE COURT:  Thank you for coming.

15         MR. SUNDARAM:  And that's his fiancé, Ms. Pride.

16         You have letters from both of them.

17         Ms. Pride is a working person.  They are on the

18  verge of wanting to start their life together.  They're

19  engaged right now.

20         The Government, you know, says these aren't -- to

21  paraphrase:  These aren't, like, outstanding, specific things

22  that really are such great personal qualities that they should

23  support a substantial variance.

24         The issue is -- the Court knows this also and the

25  Supreme Court has said this in *Spears* and in other cases --

1   that you don't have to have, like, something outstanding, you

2   know, to vary.  I understand that whenever defendants and

3   their lawyers have something particularly outstanding, they

4   use that.  But I think a person who is, you know, who has been

5   devoted to his profession and does a lot of community

6   service -- that was discussed in the letters.  He gives free

7   haircuts to kids when they're starting school.  He doesn't

8   have a lot, but he does give when he can.  His personal

9   qualities have been described by both his mother and his

10  fiancé I think genuinely, by his clients.  And I think you

11  have a letter today from a person who is a lawyer, who is I

12  think a cousin of Ms. Pride who has known his -- and also a

13  client of Mr. Gray's.

14          So, I mean, this is a person who is -- you know, the

15  Government seems to fear that if you impose a punishment

16  that's too lenient, you know, something really bad is going to

17  happen, but -- or they think is too lenient.  But if -- you

18  know, Mr. Gray is going to be around and your ability to

19  supervise him isn't going to go away.  And if you're really

20  worried about, you know, giving -- about not being able to

21  sentence him appropriately, if he proves you wrong, if you

22  give him a chance, then you can sentence him to probation and

23  he will be facing up to 20 years, you know, for the rest of

24  his life.  Or at least not for the rest of his life, for a

25  period of probation.

Proceedings                    20

1        So, you know, and we don't talk about the Section D

2   that much.  I don't think it's discussed as much as it should

3   be.  It's not limited to cases where somebody has a drug

4   addiction or -- you know, but in this case you have somebody

5   who is striving to improve himself, taking classes.  He's

6   stopped paying for them because he didn't want to keep

7   investing money if he is going to end up going to prison.  His

8   plans with his fiancé are similarly somewhat in limbo.  I

9   mean, they're going to get married, but, you know, he wants to

10  get this case behind him and know what's going to happen to

11  him before he makes the rest of those plans.

12        And on punishment, you know, getting a felony

13  conviction for somebody who doesn't have one, it's a

14  significant punishment.  Having the stress of this case for

15  the last two years is not intended as punishment, but it has

16  that effect.  And being on supervision for a period of

17  additional time does, too.  And if the Court were to impose --

18  I don't think it's necessary, but if the Court were to impose

19  home detention or even community confinement, which would be

20  closer to incarceration, then those would be all the ways of

21  meting out a punishment and promoting respect for the law

22  short of incarceration.  Incarceration would be, you know,

23  very disruptive and it just isn't really necessary.

24        I think from what I've learned with Mr. Gray -- he's

25  been to my office a number of times because he wanted to

Proceedings                                          21

1  review the sets of discovery in person and he can only do it

2  when he's with me.  So, I met him a number of times in person.

3  And I can tell you, I think he's somebody who is worth taking

4  a chance on.  And if the Court were to give him this

5  opportunity, I'm very confident you will never hear from him

6  again.  And if you do it, it will be for something like having

7  a gummy.

8              Thank you.

9              THE COURT:  Thank you, Mr. Sundaram.

10             Mr. Gray, you don't have to say anything, but if

11 there is anything you would like to say, I'm happy to hear

12 from you.

13             THE DEFENDANT:  Thank you, Your Honor.

14             First and foremost, as I stand before you today, I

15 really want to thank you for giving me the opportunity to

16 speak to you.

17             First, I want to apologize for being in your

18 courtroom on behalf of these charges.  I'm very apologetic.

19 The last 24, 36 months I've been trying.  I won't go into

20 details.  Very apologetic for my mother, my fiancé,

21 Prosecutor Wang.

22             Being here today right now is very embarrassing,

23 very detrimental to my character.  As Mr. Kannan spoke, I can

24 attest, if you take a chance on me, on my future, Your Honor

25 you will never see me again.

Proceedings                               22

1          And I'm very apologetic.  I really am.  I take

2    accountability for my actions.

3          It's a little heavy for me right now and I really

4    appreciate you giving me an opportunity to speak.

5          I have a bright future.  I'm not a father; I'm a

6    brother, I'm a fiancé, I'm a son, I'm a barber, I'm a

7    businessman.

8          And I have a bright future ahead.  We make bad

9    decisions.  We choose, you know --

10         THE COURT:  Why did you do this?  I mean, I can tell

11   you're a good guy.  Why did you do this?

12         THE DEFENDANT:  Wrong judgment.  Wrong friends.

13   Pressures sometimes.  My mom means the most to me.  I'm her

14   only child, her only son.  And you know, there is no words,

15   honestly.  Poor judgment, poor choices, pressures of life.

16   Just sometimes things comes up and you think you want to make

17   things better and you end up making it worse.  So, you know,

18   on my behalf to speak for me, you know, to you, Your Honor,

19   I'm apologetic.

20         My future never looked brighter as a barber.  I've

21   been a barber for 19 years.  I did well.  I purchased a home.

22   And I've always been there for my mom.  I've always tried to

23   take care of her.  I'm her only child.

24         And as Mr. Kannan said, incarceration is not a

25   solution.  I understand any disciplinary action that you give

1    me, I will definitely accept.  Incarceration is something that

2    I ask that you have mercy and leniency on my future and my

3    being.

4              And again, Judge Cogan, I am very apologetic for

5    being in front of you, choosing the choices that I chose.  You

6    give me another opportunity at life, I will excel and I will

7    make better decisions.  I will make better decisions.  Excuse

8    me.  And just be there for my family, my mom.

9              And I conclude it on that, Your Honor.

10             THE COURT:  All right.  Thank you.

11             I will hear from the Government.

12             MR. WANG:  Your Honor, I largely want to respond to

13   some of the comments Defense Counsel just made.  And these are

14   all 3553 arguments.

15             Defense Counsel essentially stuck to the line of

16   this was an aberration, that this was maybe a first-time

17   endeavor or a second-time endeavor, it's not indicative of the

18   Defendant's overall character or his past conduct.  I think

19   the Court recognizes that based on the scale of the conduct at

20   issue here that no one disputes that that's not the most

21   reasonable inference.  Whatever the source of the money, for

22   instance, during the first venture in January 2022, $35,000,

23   partially from personal savings or gambling winnings, no

24   reasonable person would believe that that was someone's first

25   venture into drug trafficking.  Nobody wakes up and says, oh,

1   here's an opportunity to put together a package, buy a few

2   kilograms of cocaine and then do what, try to find some random

3   buyer on the street?  This is something that someone only does

4   if they have a preexisting relationship or understanding with

5   someone else that cocaine is going to be then divided up and

6   sold on the street or sold wholesale to other buyers.  Either

7   way, those are not the actions of a first-time actor in this

8   world.  People who get involved in drug trafficking in a

9   non-drug mule, drug courier sort of capacity start elsewhere,

10   they start smaller.  They start selling eight-balls, dime

11   bags, smaller quantities.  They get involved in smaller deals.

12   Someone doesn't just jump into the first venture in collecting

13   $35,000 to buy several kilograms of cocaine.

14          And yet, despite being stopped by law enforcement,

15   being held for some period of time and having $35,000 seized,

16   the Defendant was undeterred.  And I do think deterrence here

17   is a very important factor for the Court to consider.  I

18   understand the Defendant is apparently remorseful and is sorry

19   to be here.  I'm sure he feels very embarrassed to be here

20   with his family members.  That's a natural human emotion to

21   feel.  But that essentially adds up to he is sorry he got

22   caught, not sorry that he did this.

23          And the Defendant, within the same calendar year

24   decided, oh, perhaps law enforcement scrutiny of my actions is

25   not that serious, I'm going to go ahead and do this again.  At

Proceedings                                25

1    the end of the year collecting $15,000 and tried to do this

2    again.  This was not a one-off.  He had every intention of

3    doing this again.  He tried to do it again.  And there's every

4    indication from the discovery that this was not the first time

5    he had done this.

6           This isn't described in my letter, Your Honor, but

7    this is in the discovery and I don't think there's any dispute

8    about this, that during phone calls between Lozano and the

9    source of information, the CS, et cetera, there are references

10   to Lozano having done previous deals in the United States and

11   asking whether or not the source of information or CS could

12   send someone who could speak English because his friend or his

13   partner in the States couldn't speak Spanish that well.  I

14   think the reasonable inference from all the conversations

15   leading up to those transactions is that Lozano's friend or

16   partner in the business here on the States side was the

17   Defendant.  He had this relationship with Mr. Lozano, who was

18   based in Colombia.  One does not just have an agreement with

19   someone they don't know with a fairly high degree of trust to

20   engage in that sort of a transaction.

21          So I think the only reasonable inference from all

22   those calls and the other evidence is that the Defendant has

23   done this before.  This was not an aberration.

24          I also want to speak to the Defendant's professed

25   level of remorsefulness and desire to take accountability.  At

Proceedings                                26

1   no point during negotiations prior to the Defendant's plea to

2   the indictment, there was no agreement here.  And no point

3   prior to the defendant's plea was any offer or any discussion

4   had about potentially proffering with the Government, sharing

5   information about what he knew about others or what he had

6   done in the past.  And Your Honor, what that means is

7   ambiguous, but I do believe one fair inference from that is

8   also that the Defendant did not want to put himself in a

9   position of further incriminating himself and speaking of

10  other criminal conduct that he had engaged in.  Otherwise, why

11  abandon the potential benefit of an additional two-level

12  downward adjustment on the Guidelines?

13         So, Your Honor, I think when this all -- this all

14  adds up to the Defendant having been engaged in this sort of

15  conduct for quite some time.  And that's all the more galling

16  because the Defendant, as everyone recognizes, has had a long

17  history of stable and relatively successful employment.  There

18  wasn't some acute financial need to do this.  This was purely

19  a crime of opportunity.  This was greed.  And again, the

20  Defendant's personal history and characteristics, whether for

21  personal need or other personal circumstances, don't counsel

22  in favor of some sort of significant downward variance.  The

23  Defendant doesn't have dependents, he doesn't have young

24  children, he's not caring for other family members.  He hasn't

25  engaged in some sort of outstanding wholly remarkable

Proceedings                                27

1    community work that would deprive the community were he

2    sentenced to a term of incarceration.

3         And as for the other points raised by

4    Defense Counsel, the amount of punishment the Defendant may

5    have already experienced, what this would mean for things like

6    deterrence or respect for the rule of law.  The Defendant was

7    released on bail the day after he was arrested.  He has never

8    spent more than perhaps one night in a jail cell.  And since

9    that time he's had an utterly unremarkable set of supervisory

10   conditions.  He wasn't on home confinement.  He didn't have

11   electronic monitoring.  He didn't have anything like that.

12   And so yes, I understand the mental stress of awaiting the

13   outcome of a case, but it was not because of conditions

14   imposed via supervision.

15        The last thing I will say, Your Honor, is for a

16   defendant to be sentenced to probation or supervised -- or

17   time served, whatever it may be couched as under these

18   circumstances, for a crime and for a history of apparent

19   criminality of this magnitude would do serious harm to the

20   community's respect for the rule of law.

21        Dealing in multiple kilograms of cocaine as someone

22   who is clearly invested in flipping that for a profit, not as

23   a mere courier or drug mule or anything like that, would send

24   entirely the wrong message that one could be caught red-handed

25   and say, I'm sorry, I'll never do it again, and you get off

1  without any actual serious punishment.  Your Honor, I think

2  that would do real harm to respect for the rule of law.

3          Your Honor, I know that the Court is going to find

4  that the Guidelines are 37 to 46 months of imprisonment.  Our

5  original recommendation was for a sentence at the high end of

6  a 46- to 57-month range.  In light of the Guidelines that the

7  Court will find control here, the Government continues to

8  recommend that a sentence in that range is appropriate.  In

9  other words, we are moving for an upward variance from the

10 37 to 46 range.

11         MR. SUNDARAM:  Your Honor, can I respond to just a

12 few of those things?

13         THE COURT:  Yes.  Briefly.

14         MR. SUNDARAM:  Your Honor, I'm not -- I remain in

15 disagreement with Mr. Wang's factual arguments.

16         But I do want to just say that I don't think it's

17 fair to make inferences about, to make negative or adverse

18 inferences against a defendant, you know, who has counsel and

19 we've talked about, you know, various options and things,

20 based on for the Defendant not proffering.

21         THE COURT:  I agree.  I'm not drawing anything from

22 that.  That's his right.

23         MR. SUNDARAM:  And beyond that, I mean, I think, you

24 know, an issue is I guess a lot of this is just general

25 sentencing philosophy, and personal viewpoints I know vary

1    among lawyers and vary among members of the bench.  It's --

2    some of this comes down to which -- I mean, this is a -- this

3    is -- he does stand before you without having a criminal

4    record, a criminal history.  And it's -- and even -- I mean,

5    the Government is making a distinction between somebody who is

6    remorseful about having gotten caught versus remorseful for

7    what they did.  Clearly the two things are very connected.

8    They're not entirely separable, but I do think that Mr. Gray

9    is genuinely embarrassed and mortified by putting his family

10   in this position and having them even see him in this light

11   and being seen in this light by others.  It was difficult for

12   him to ask clients and friends to write letters for him

13   because he was ashamed and embarrassed by his conduct.  And

14   sentencing, as you know, is a very individual process.  It

15   doesn't -- having charges facing you, having incarceration

16   hovering over you doesn't affect everybody the same.  And you

17   know, somebody who even if -- even if the Court were to accept

18   or somewhat entertain, you know, some of the Government's

19   inferences, there is still a big difference in impact between

20   a person who has not been incarcerated and a person who has.

21   And so, you know, that's why the -- when you're looking at

22   what's necessary for deterrence, that's really important.

23           And a lot of this, I think what it comes down to in

24   the end is what is going to trouble the Court more, giving

25   somebody a punishment that may or may not be necessary or may

Proceedings                                    30

1   be unnecessary on the one hand, sending this man at this

2   juncture of his life -- he's 41 -- to prison for the first

3   time.  And if you do that, you'll never know whether it was

4   necessary.  If you don't do that, you'll have to live with

5   somebody -- you know, I think this is the Government's main

6   concern, is somebody got away with something and didn't pay an

7   adequate price for it.  But in the end, if the Court is never

8   going to hear from or see Mr. Gray again, I think that means

9   that in this case you made the right call.  Because, yeah, I

10  mean, punishment is sort of the foundation of our system I

11  think a little bit too much.  And you give somebody a non-jail

12  sentence, you never hear from them again, I think that

13  counsels in favor of, and especially in light of the parsimony

14  clause, finding that it wasn't really necessary.

15          And, you know, mercy is appropriate, as was stated

16  in the letter that the Court received from the family friend.

17          Thank you.

18          THE COURT:  I've considered all of the factors under

19  3553(a), including the advisory Guidelines.

20          Mr. Sundaram is right that I'm generally not a

21  particularly Guidelines-oriented judge.  I have a duty to

22  consider the Guidelines and I certainly take that seriously,

23  but I tend to use the Guidelines as a, just to check it

24  against where I think the other factors come out and I go with

25  the other factors if there is a difference.

Proceedings                                31

1        The problem I'm having here is when I look at the

2   other factors, particularly the nature and circumstances of

3   the offense and I think they kind of blend in here with the

4   second factor, which is the characteristics of the Defendant,

5   I can't get beyond, Mr. Gray, that I just think you were in

6   this business.  You know, the fact that you got stopped once

7   and the $35,000 was there and then you go back and do it again

8   and that you would need connections to do something with these

9   drugs if it had gone down successfully, you know, if it hadn't

10  been a setup operation, that suggests to me you knew all about

11  this environment.  Maybe not all about it, but you knew things

12  about it.  And I think if it had not been a setup operation

13  and if Mr. Lozano -- if it had gone down the way Mr. Lozano

14  wanted it to go down, he would have come back to you and then

15  you would have done it again and again and again.

16        I think your remorse is serious, but I think your

17  remorse is because you see what a big mistake it was to have

18  done this.  But you were in it.

19        And I can't treat you like -- you know, sometimes we

20  have these people from South America or the Caribbean who for

21  a couple of thousand dollars smuggle in on their bodies or

22  ingesting drugs because they're in desperate situations.  And

23  we're very lenient with those people because they don't know

24  what they're carrying or how much and they're getting very

25  little money for it and, you know, they're just hopeless

Proceedings                                    32

1   people.

2            You don't really have any of those factors here.

3   You had a good upbringing, not a desperate upbringing by any

4   way.  And there's really no reason for you to have done this

5   except -- I hate to say it this way, but it's just greed.  You

6   just wanted more money.  You know, being a barber wasn't good

7   enough, so you wanted to get more.  And that's not mitigating.

8            Everybody spent a lot of time talking about

9   deterrence, both general and specific.

10           I am a little concerned about specific deterrence.

11  I think the odds are that you've been scared straight by

12  getting caught at this and seeing how bad it is.  And I don't

13  doubt the toll it has taken to have this hanging over your

14  head like the sword of Damocles.  I can only imagine what

15  that's like.  I am concerned, though, that when the police

16  stopped you, which is as close as you can get to getting

17  caught, you still came back and made another run at it.  And

18  that does suggest that it takes a lot more than just being

19  scared to make absolutely sure, or as close to absolute as I

20  can get, that you get the message that you're not going to do

21  this again.

22           Now, as far as general deterrence, I agree with

23  Mr. Sundaram that whatever I sentence you here today, you

24  know, it's not going to get out on the streets and people are

25  going to go, oh, you know, look, he got away with this so now

Proceedings                    33

1   we should do more, so we should get away with it.  I don't

2   think of general deterrence, though, in those terms.  I think

3   of general deterrence in terms of if a pattern is set of

4   routine leniency for certain kinds of crimes, that's what gets

5   out, the word of the pattern.  And judges really shouldn't

6   contribute to that word on the street of the pattern.  That's

7   what undercuts general deterrence.  And while there's some

8   cases in which you've got to take that risk, a judge has to

9   take that risk and say maybe I'm contributing to this, maybe

10  not.  You're not sympathetic enough for me to take that risk

11  because there was just no reason for you to be in this

12  business.  There was no reason for you to commit this specific

13  crime.

14          What I am taking into effect, and I think it's a big

15  thing, is that you haven't been in jail before.  It's going to

16  be harder for you than people who come in here and have served

17  time before, even short time.  We get a lot of people in here

18  who spent a month, six months in state jail and, you know,

19  this is a new thing for them, being in federal court, but at

20  least they've seen some jail before.  This is harder for you

21  and I appreciate that.  And that's why I'm rejecting the

22  Government's request that I vary upwards, above 46 months or

23  even at the top of the Guideline range.  I'm not going to do

24  that.  I don't think that's necessary.

25          But when I consider the fact that, you know, I think

1    you were in this business, I think it wasn't all puffing,

2    there was some puffing, what you told the contact, and that

3    you had to have arrangements for getting rid of these drugs

4    and that you knew somebody from South America, that, you know,

5    you could set up this connection with, it just -- the idea of

6    a noncustodial sentence here just does not work for me at all.

7              So based on all of those considerations, I do think

8    this is one of the unusual cases where the Guidelines reflect

9    the proper constellation of all of the factors I've got to

10   consider under the statute.  And Mr. Sundaram is right, that

11   doesn't happen for me often, but I think it does happen here.

12             So I am going to pronounce a sentence of 37-months'

13   custody.

14             3 years of supervised release, which is the

15   statutory minimum.  I am not going to impose any special

16   conditions of that supervised release.  The standard

17   conditions will be enough.

18             I am not going to impose a fine because I don't

19   think it can be afforded.

20             I will impose the $100 special assessment.

21             Is there a forfeiture here?

22             MR. WANG:  Your Honor, we didn't have an agreement

23   here, so we didn't have any agreed-upon forfeiture amount

24   here.

25             THE COURT:  Okay.  Well, you could move for a

Proceedings                                    35

1    forfeiture.

2              MR. WANG:  Yes, Your Honor.

3              And that said, I will -- I apologize, I should have

4    had this information ready.  I'll have to check on the status

5    of the money that has been seized.  It's possible it's already

6    been administratively forfeited.  But if it's not and we need

7    to move for a judicial order, we will do so.

8              THE COURT:  Okay.

9              All right.  We have an open count?

10             MR. WANG:  No, Your Honor.  This is the sole count

11   as to this defendant.

12             THE COURT:  Okay.

13             Anything further?

14             Well, let's talk about a surrender date.  What I

15   would like to do is keep him out until he gets designated.  I

16   think that's taking about six weeks, maybe eight weeks now.

17             Pick a date, Mr. Sundaram.

18             MR. SUNDARAM:  I think it's -- yeah, I think it's a

19   little longer than six.  It's longer than it used to be.

20             THE COURT:  Do you want to talk to him about when he

21   would like to surrender?

22             MR. SUNDARAM:  Yes.

23             (Defense Counsel conferring with client).

24             MR. SUNDARAM:  Your Honor, I'm going to request two

25   months, surrender date.

```
                          Proceedings                    36
```

1            THE COURT:  Okay.

2            MR. SUNDARAM:  And I would like to have a little

3    more time to talk to Mr. Gray about designation.  And I can

4    file a letter, or send an e-mail if that's sufficient, to

5    chambers with our designation requests.

6            THE COURT:  I usually put it in the judgment, which,

7    you know, I need to enter fairly quickly.  But either I can do

8    an amended judgment or I can send a separate letter with a

9    recommendation.  So yes, take your time.

10           Tasha, can we have a date two months out.

11           THE COURTROOM DEPUTY:  October 25th.

12           THE COURT:  All right.  October 26th, surrendering

13   to the --

14           THE COURTROOM DEPUTY:  No, 25th.  It's a Friday.

15           THE COURT:  Oh.  25th, surrendering to the

16   designated facility.

17           If he hasn't been designated, let me know,

18   Mr. Sundaram, and I'll extend that another 30 days until he is

19   designated.  I don't want him surrendering to the MDC.

20           Mr. Gray, you've given up your right to appeal your

21   conviction by pleading guilty.  But if you want to appeal the

22   sentence I have just imposed, you have that right.  You need

23   to file what is called a notice of appeal within 14 days.

24   Mr. Sundaram will do that for you if you ask him, I'm sure.

25   You can certify to the Clerk of the Court that you can't

1  afford a lawyer and the clerk will file it for you.  But you

2  have to get it filed within 14 days no matter how it's done or

3  you will have waived your right to appeal your sentence.

4          Do you have a question?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  Ask Mr. Sundaram first before you ask

7  me.

8          THE DEFENDANT:  Okay.  I'm sorry.  I don't have a

9  question.

10          THE COURT:  That's okay.

11          THE DEFENDANT:  I actually had one following

12  conclusion to speak with you, Your Honor, if you give me the

13  opportunity to speak with you.  I know you've already

14  concluded your decision, but I have one conclusion that I

15  would like for you to consider.  I know you can't go back on

16  your sentencing, but it would be something that I would ask

17  that you would consider.  I'm sorry.

18          Is that possible?

19          THE COURT:  Sure.

20          THE DEFENDANT:  So, Your Honor, I know you made your

21  decision to give me 37 months.  It's a very hard decision for

22  me to swallow.  And I know you've made the statement that,

23  Mr. Gray, you just don't seem sincere enough.  And I can't

24  disagree or agree with you on that.  The one thing that I kept

25  on my mind when I came in here was authenticness {sic} and

Proceedings                                    38

1   sincerity.

2           THE COURT:  Can I tell you something; I think you

3   got the wrong message.  I'm not saying that you're not sincere

4   as you stand here now.  I'm sentencing you primarily on the

5   basis of what you did and where you're coming from.  I do not

6   think that you're lying to me now when you tell me you're not

7   going to do this again.  Okay? I do not think that.  I don't

8   think that for a minute.  Okay?

9           I will tell you, just about everybody I sentence

10  says to me they're not going to do this again.  Most of them

11  believe it.  And some of them stick to it and some of them

12  can't stick to it.  I hope you're one of the guys that can

13  stick to it.  I said specific deterrence; I'm not really

14  worried about it with you.  I don't think you're going to do

15  it again.  I have a little concern that you might slip because

16  being caught the first time wasn't enough.  But, you know, I'm

17  pretty much taking you at your word that you're not going to

18  need to be stopped again.  That's not really what affected my

19  sentence very much.  What affected me was what you did and

20  where you're coming from in doing that.  So don't feel you

21  have to persuade me that you are authentic; I pretty much

22  accept that.

23          Okay.  Anything further?

24          MR. WANG:  Not from the Government, Your Honor.

25  Thank you.

Proceedings                                    39

1            THE COURT:  We are adjourned.

2            (Matter concluded.)

3

4                    *    *    *    *    *

5

6    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

7

8        /s/ Andronikh M. Barna              September 3, 2024
     _____    _____
9        ANDRONIKH M. BARNA                  DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25